(120 App. Div. 604; 121 App. Div. 903)

### FRIED v. DANZIGER et al.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1907.)

1. PARTNERSHIP—DISSOLUTION—CREDITORS—MARSHALING ASSETS.

Where all the creditors of a partnership are on the same plane in the order in which assets are to be marshaled for distribution among them, any agreement favoring a few to the exclusion of the others will not be upheld, unless made with the assent of all.

2. CONTRACTS—LEGALITY—PUBLIC POLICY.

In an action by a partner against the other members of a firm for a dissolution of the partnership, a temporary receiver of the firm assets was appointed. Subsequently plaintiff, as attorney for certain creditors, commenced bankruptcy proceedings against the firm, and, before he would comply with the wishes of the majority of the creditors and discontinue the proceedings, induced defendants, the attorneys in the action in the state court, to agree to pay him and his clients 80 per cent. of whatever allowances were made defendants for services. The other creditors were ignorant of this agreement, under which defendants were to obtain as large allowances as possible, and to make applications therefor without notice to the creditors. *Held*, that the agreement was against public policy and illegal.

Appeal from Equity Term, Erie County.

Action by Joseph Fried against Henry Danziger, Jr., and others. Judgment for plaintiff, and defendants appeal. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Vernon Cole, for appellants.

Simon Fleischmann, for respondent.

SPRING, J. In April, 1901, I. Henry Danziger, as attorney for one of the copartnership firm of Danziger Bros., carrying on the wholesale clothing business in the city of Syracuse, commenced an action in the Supreme Court against the two other copartners for a dissolution of the copartnership. Leo Frank was appointed temporary receiver of the copartnership assets on the day the action was commenced, and appeared by Baker & Schwartz, his attorneys. On the 15th of August, 1901, the plaintiff, appearing as attorney for certain creditors of Danziger Bros. holding claims to the amount of $2,100, caused a petition in involuntary bankruptcy to be filed in the United States District Court for the Northern District of New York. The copartners appeared in this proceeding, which ultimately resulted in an adjudication that the copartners as a firm and individually were bankrupts. The aggregate assets of the copartnership were nominally several hundred thousand dollars, although they produced only $53,523.51, and the liabilities were $268,038.

There were, therefore, two proceedings pending to accomplish the distribution of the assets of the firm among its creditors. Mr. Danziger, the attorney in the copartnership action, and Mr. Schwartz, on

behalf of the temporary receiver, carried on negotiations with the plaintiff after the adjudication of bankruptcy for the purpose of securing a discontinuance of the bankruptcy proceeding. In March, 1902, an agreement was consummated by these various attorneys whereby the proceeding in the United States court was to be discontinued, and Baker & Schwartz and Danziger were to carry through the action pending to secure a distribution of the assets of the copartnership, and of the costs and allowances obtained in the action 80 per cent. were to be paid to the plaintiff and 20 per cent. to be retained by these attorneys, except that Schwartz was to keep $500 already allowed him and have $250 for his disbursements. In describing the terms of the agreement, the plaintiff testified:

"The consideration of this agreement was that if we would agree to dismiss the bankruptcy proceedings, provided all the other creditors would consent, I was to get, for the benefit of my clients and myself, a share of their fees to whatever extent we might agree upon; at least, myself and my clients might agree upon. I communicated this agreement to the creditors I represented."

Or, as Danziger bluntly put it: ·

"Mr. Fried's fees, Mr. Schwartz's fees, and my fees were to be pooled; 80 per cent. were to go to Mr. Fried; and 20 per cent. were to go to me."

Just why Schwartz and Danziger were willing to surrender four-fifths of the sums to be awarded them for their legal services in carrying the action to its termination is not clear, if the awards were to represent the actual value of the services performed. The plaintiff had been already allowed in the bankruptcy proceeding $1,200 and according to his testimony, and as the court has found, this sum was not to be included in the agreement.

The bankruptcy proceeding was accordingly discontinued, and the assets were converted into money and distributed by the receiver appointed in the action. Of the $53,000 received by him, more than $35,000 were expended for costs, expenses, and other disbursements enumerated in his final report, leaving only about $18,000 to be doled out to the creditors, who received less than 7 per cent. of their demands. There were allowed to Baker & Schwartz and to Henry Danziger, at various times extending to January 22, 1904, in the aggregate $6,550, besides $1,449.97 for disbursements—in all, $8,099.97. In November, 1904, Danziger paid to the plaintiff $2,880, who has brought this action for an accounting and to recover the amount unpaid according to the agreement, and has recovered $2,040, besides interest.

A meeting of the New York creditors of the insolvent copartnership was called while the negotiations were pending for the purpose of securing their adherence to the prosecution of the bankruptcy proceeding. Mr. Czaki, the attorney representing the plaintiff, testified that:

"These creditors were almost unanimous in their opinion that the proceedings were ill-advised, and they refused their support to our particular clients in the continuation of the bankruptcy proceedings. It was between September and January, in the fall of 1901. I do not recall the exact time. Mr. Fried thereafter consented to the dismissal of the bankruptcy proceedings, and there was an order made dismissing them."

There is no substantial controversy over the facts, and they may be fairly comprehended in this statement. The plaintiff, representing creditors whose claims aggregated less than $11,000 of the entire indebtedness of nearly $270,000, was in charge of the bankruptcy proceeding. The creditors generally were in favor of prosecuting the action in the state court, which had been commenced 3½ months prior to the filing of the petition in the United States court, and discontinuing the bankruptcy proceeding. Before he would comply with the wishes of the great majority of the creditors and discontinue that proceeding, he insisted on being paid for himself and his clients 80 per cent. of whatever allowances were made to the attorneys in the state court. The other creditors were not cognizant of the preferential plan by which the creditors represented by the plaintiff were likely to receive a large percentage, while they would get a pittance of their claims. The attorneys for the receiver and Danziger assented to this agreement. They desired at all hazards to control the administration of the insolvent estate. The Danzigers and Schwartz, the attorney for the receiver, were related, and the apparently complicated affairs of the copartnership could be managed more in accord with their wishes if they were in entire joint control.

The conclusion is a reasonable one that the plaintiff took advantage of this desire, and as a condition of discontinuing the bankruptcy proceeding compelled a liberal exaction of Danziger and Schwartz. Notice was served on all the creditors of the insolvents of the discontinuance of the proceeding. There is nothing, however, to indicate that these creditors, aside from those who were to gain preferentially, knew of the terms of the agreement, or were aware that some creditors were to receive indirectly a greater proportional share of the assets of the firm than the creditors who were not favored by being clients of the plaintiff. Unquestionably, the parties to the bankruptcy proceeding had the right to join in asking for its discontinuance, and their agreement to discontinue would constitute a valid consideration for money paid to them. Such an agreement must be open and free from any taint of a secret arrangement for the benefit of a few before it will receive the sanction of a court of equity. Where all the parties are on the same plane in the order in which assets are to be marshaled for distribution among them, any agreement favoring a few to the exclusion of the others will not be upheld, unless made with the assent of all. Adams v. Outhouse, 45 N. Y. 315; Bliss v. Matteson, 45 N. Y. 32.

There is, however, another element in the agreement which we believe is against public policy and in contravention of the just administration of the rights of the litigants by the courts. The parties to this agreement were all lawyers. Their arrangement was not that a specified sum or a definite proportion of the assets of the firm should be paid to the creditors who abandoned the bankruptcy proceeding. The pith of their agreement was that Danziger and Schwartz should continue the action for dissolution of the copartnership and obtain allowances from time to time by orders of the court, and of these allowances 80 per cent. should be paid to the plaintiff. The work was to be performed by the attorneys who were to receive only one-fifth of the sums

actually awarded, while the attorney who rendered no service whatever was to obtain the bulk of the amount allowed. In effect, the agreement was that Schwartz and Danziger, the one representing the receiver and the other his relatives, the insolvent debtors, were to join together to procure as large allowances as possible, and then distribute them in accordance with the agreement. There is nothing in the earlier letters which in terms indicate that such was the agreement; but it finds support in the letter of Danziger, the attorney, to Czaki, the representative of the plaintiff, bearing date November 30, 1903, in which he says:

"I believe it will be impracticable to ask for any allowance at the time of the hearing of this motion. There is no doubt to my mind that some creditors will be represented in court. The estate in itself does not make the best of showings, and if, on top of the argument over settlement, comes a request for allowances, while I have no doubt it would be granted, still I think the amount would be materially affected. There is nothing that requires us to make this application on notice, and it is certainly for our best interests that the application be made to the judge in chambers, and when the circumstances are most favorable to ourselves."

The scope of the agreement to us is convincing proof that it was expected by the parties to it that Schwartz and Danziger were to endeavor to swell the awards for costs and services to the fullest extent. The temptation to make undue efforts in this direction was manifest when they were to get only one-fifth of the sums realized. If the judge who granted the allowances had known of this agreement, he would probably have insisted on a careful scrutiny of the sums asked for, and would have also required the creditors to be represented, and their assent procured to the agreement made by these attorneys. The allowances were for legal services rendered, and not to augment the sums to be distributed among a few of the creditors. Danziger's letter referred to implies that the attorneys were not desirous of making any application for allowances when the creditors were present. They preferred to make the application without notice "to the judge in chambers and when the circumstances are most favorable to ourselves." There was every inducement to make the application for these awards when no one was present to oppose. The scheme is the expected result of the agreement which is the basis of the plaintiff's cause of action. Its performance would tend to lower professional honor and cut asunder the ethical relation which should subsist between the attorney and his client.

It is claimed that there is nothing in the record which challenges the reasonableness of the sums allowed. Possibly not in distinct terms. The whole scheme has a suspicious cast, and compels the belief that the allowances were extravagant. The agreement provided for an unjust division of the sums to be awarded. The interest of the attorneys was unduly stimulated to secure excessive compensation; otherwise, there would be little to distribute among those who were to receive only one-fifth of these allowances, while they did all the work. The letter of Danziger already quoted discloses that the attorneys realized the importance of keeping their design secret and applying for allowances when there was no one to sift the charges or protest against them. The agreement, with its ex parte method of consummation,

was an imposition upon the court and unfair to the creditors. The sums awarded in pursuance of it were quite apt to exceed just compensation for the services performed. No other inference is reasonable.

The plaintiff has already received $2,880 to apply on an agreement which we think was unconscionable and demoralizing to the frank, honest practice of law. He has brought his action in equity for an accounting and to recover the balance found due on the agreement. An affirmance of the judgment would be a vindication, a judicial approval, of the scheme, which ought not to be tolerated unless the practice of our profession is to degenerate into a strife for extortionate allowances. Schwartz died before the action was commenced, and his personal representatives and the surviving lawyers are the only parties to the litigation. All we can do is to follow the rule that, when one attempts to enforce an illegal or unjust agreement, courts will not interfere to give it validity. Solinger v. Earle, 82 N. Y. 393. The judgment should be reversed.

Judgment and order reversed, and a new trial ordered on law and facts, with costs to the appellant to abide event, with leave to the plaintiff to withdraw his appeal to the Court of Appeals, without costs. All concur.